IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD MILLER, JR. and RENEE MILLER,   )
          Plaintiffs,                )
                                       )
          vs.                       )        Civil Action No. 13-352
                                       )        Judge McVerry
EME HOMER CITY GENERATION, L.P., et al.,   )        Magistrate Judge Mitchell
          Defendants.              )

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion to dismiss filed on behalf of defendants
Edison International, Inc., Edison Mission Group, Inc., Mission Energy Holding Co., Edison
Mission Operation & Maintenance, Inc. and Edison Mission Marketing & Trading, Inc. (ECF
No. 29) be granted.

II.    Report

Plaintiffs, Richard Miller, Jr. and his wife Renee Miller, bring this personal injury action
arising out of serious injuries that Richard Miller received on February 10, 2011 when a steam
pipe ruptured at the Homer City Electricity-Generating Power Plant where he was working.
They named as defendants fourteen companies that they believed to be involved in the ownership
and/or operation of the plant. Nine of the companies have declared bankruptcy and all
proceedings have been stayed with respect to them.

Presently pending before the Court is a motion to dismiss, filed by the remaining five
defendants: Edison International, Inc., Edison Mission Group, Inc., Mission Energy Holding Co.,
Edison Mission Operation & Maintenance, Inc. and Edison Mission Marketing & Trading, Inc.
(together, "the moving defendants"). Specifically, they argue, pursuant to Federal Rule of Civil
Procedure 12(b)(6), that the allegations of the complaint are too general and do not identify how

any of them is allegedly connected to the claims herein. They also contend, pursuant to Rule 12(b)(2), that three of them (Edison International, Inc., Edison Mission Operation & Maintenance, Inc., and Mission Energy Holding Co.) have no connection to Pennsylvania and thus personal jurisdiction cannot be asserted over them. Plaintiffs have agreed to dismiss Mission Energy Holding Co., but otherwise oppose the motion. For the reasons that follow, the motion should be granted.

Facts

Richard Miller states that he was employed by Brand Scaffold and Energy Services and was working at the power plant known as EME Homer City Generation, located at 1750 Power Plant Road, Homer City, Indiana County, Pennsylvania, inspecting scaffold. On February 10, 2011, he was inspecting scaffold when suddenly and without warning, an inlet superheater feeder pipe nearby ruptured and released highly pressurized steam. Miller suffered severe and permanent injuries, including multiple burns, and he has required hospitalization and numerous surgeries and has endured excruciating pain, suffering, disfigurement and loss of enjoyment of life. (Compl. ¶¶ 3, 6.)[1] His wife alleges that she has lost the society, comfort and services of her spouse. (Compl. ¶ 11.)

Procedural History

On February 8, 2013, Plaintiffs filed a complaint in the Court of Common Pleas of Indiana County, alleging claims of negligence (Count I), loss of consortium (Count II) and punitive damages (Count III). On March 11, 2013, Defendants removed the case to this Court, asserting diversity jurisdiction in that Plaintiffs are Pennsylvania citizens; Defendants are various entities (corporations, LLCs and LPs) that are citizens of California, Illinois, Delaware and

---

[1] Notice of Removal (ECF No. 1) Ex. A.

Massachusetts; and the amount in controversy, excluding interest and costs, exceeds $75,000.000 (ECF No. 1 ¶¶ 6-30).  On March 13, 2013, a suggestion of bankruptcy was filed as to defendants Chestnut Ridge Energy Company, Mission Energy Westside, Inc., Edison Mission Energy, Edison Mission Energy Fuel Services, LLC, Edison Mission Holdings Co., Midwest Generation, LLC, and Midwest Generation EME, LLC (ECF No. 4), and on March 14, 2013, the case was stayed as to these seven defendants (ECF No. 5).  On April 3, 2013, EME Homer City Generation, L.P. ("EME Homer City") filed an answer to the Complaint (ECF No. 8).

On that same date, a motion to dismiss was filed by six defendants: Edison International, Inc. (EIX), Edison Mission Group, Inc. (EMG), Mission Energy Holding Co., Edison Mission Operation & Maintenance, Inc. (EMOMI), Edison Mission Marketing & Trading, Inc. (EMMT), and Homer City Property Holdings, Inc. (ECF No. 9).  In response to this motion, Plaintiffs requested leave to conduct jurisdictional discovery (ECF No. 13).  On May 7, 2013, an order was entered, dismissing the motion to dismiss (with leave to be refiled) and granting Plaintiffs until July 1, 2013 to conduct jurisdictional discovery (ECF No. 14).

On May 7, 2013, a suggestion of bankruptcy was filed as to defendants EME Homer City and Homer City Property Holdings, Inc. (ECF No. 15) and on May 8, 2013, the case was stayed as to these two additional defendants (ECF No. 16).  On August 30, 2013, the remaining five defendants (that is, the same defendants that had filed the motion to dismiss on April 3, 2013, less Homer City Property Holdings, which is in bankruptcy) filed a renewed motion to dismiss (ECF No. 29), again raising the lack of individual activity alleged and the lack of personal jurisdiction over three defendants.  Plaintiffs filed a response on September 20, 2013, in which they conceded to the dismissal of Mission Energy Holding Co. but otherwise opposed the motion (ECF No. 33).  The moving defendants filed a reply brief on September 27, 2013 (ECF No. 35).

<u>Standard of Review</u>

The Supreme Court has issued two decisions that pertain to the standard of review for a motion to dismiss for failure to state a claim upon which relief could be granted under Federal Rule of Civil Procedure 12(b)(6). The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (citations omitted). Mere "possibilities" of misconduct are insufficient. <u>Id.</u> at 679. District courts are required to engage in a two part inquiry:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions…. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show the plaintiff has a "plausible claim for relief." … In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

"Although a district court may not consider matters extraneous to the pleadings, 'a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'" <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d 383, 388 (3d Cir. 2002) (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>,

114 F.3d 1410, 1426 (3d Cir. 1997)). In addition, "[c]ourts ruling on Rule 12(b)(6) motions may take judicial notice of public records." Anspach ex rel. Anspach v. City of Phila., 503 F.3d 256, 273 n.11 (3d Cir. 2007). The Court may take judicial notice of SEC filings and articles of incorporation. See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002); In re Astea Int'l Inc. Sec. Litig., 2007 WL 2306586, at *14 & nn.16-17 (E.D. Pa. Aug. 9, 2007).

The moving defendants note that, prior to filing the suggestion of bankruptcy, EME Homer City filed an answer to the complaint in which it admitted that it formerly operated the power plant at which the incident occurred. (ECF No. 8 ¶¶ 2-3.) Thus, all parties agree that this defendant is properly sued, although the case has now been stayed as to this entity because of its bankruptcy filing. The moving defendants contend that the complaint contains only generalized allegations against them as it is clear they had no connection to the plant or the incident in which Miller was injured.

According to an organizational chart which Plaintiffs have submitted, EME Homer City is owned by limited partner Chestnut Ridge Energy Co. and general partner Mission Energy Westside, Inc. (both of which are in bankruptcy). These two entities, along with Homer City Property Holdings, Inc. (which is in bankruptcy) are all owned by Edison Mission Holdings Co. (bankruptcy), which, along with EMOMI, EMMT, Midwest Generation EME, LLC (bankruptcy) and Edison Mission Energy Services, Inc. (not a named defendant herein) are all owned by Edison Mission Energy (bankruptcy), which is owned by Mission Energy Holding Co. (which Plaintiffs have agreed to dismiss), which is owned by EMG, which is owned by EIX. (ECF No. 33 Ex. 7.) Thus, two of the moving defendants (EMOMI and EMMT)[2] are two levels removed

_____

[2] The moving defendants also note that Plaintiffs admit that EMMT sells and trades energy in regional power markets and EMOMI operates and maintains wind farms (ECF No. 35 at 2, citing ECF No. 33 at 4). Thus, they contend that it is undisputed that neither entity had anything to do

5

from the operator of the plant and the remaining two defendants are five (EMG) and six (EIX) levels removed, respectively. In addition, as the moving defendants note, neither EMOMI nor EMMT has any subsidiaries—in familial terms, they would both be considered a "great uncle/aunt" of EME Homer City. The moving defendants also note that this chart shows only ownership interests, not reporting relationships, as Plaintiffs appear to assume.

W. James Scilacci, the Executive Vice President, Chief Financial Officer and Treasurer of EIX, who has personal knowledge regarding the corporate structure and general business operations carried on by EIX and its subsidiaries (Scilacci Decl. ¶ 2),[3] states that:

> [EIX] is a public utility holding company incorporated under California law.
> [EIX] maintains its principal place of business in California.
>
> [EMG] is a subsidiary of [EIX]. [EMG] is incorporated under Delaware law and maintains its principal place of business in California.
>
> …
>
> [EIX] does not own or lease any, and has not owned or leased any, real property in Pennsylvania; does not maintain, and has not maintained, any offices or employees in Pennsylvania; is not registered to do business in Pennsylvania; does not have any designated agent for service of process in Pennsylvania; and does not advertise, solicit, or transact any business in Pennsylvania and has not done so in the past.
>
> Similarly, [EMG] does not own or lease any, and has not owned or leased any, real property in Pennsylvania; does not maintain, and has not maintained, any offices or employees in Pennsylvania; is not registered to do business in Pennsylvania; does not have any designated agent for service of process in Pennsylvania; and does not advertise, solicit, or transact any business in Pennsylvania and has not done so in the past.
>
> …
>
> Neither [EIX nor EMG] directly or indirectly manage, maintain, or control operations, direct work, or promulgate safety rules or maintenance procedures at the power plant located at 1750 Power Plant Road, Homer City, Indiana County,

---

with the operation of the Homer City plant.
[3] ECF No. 30 Ex. A.

Pennsylvania and has not done so in the past.

(Scilacci Decl. ¶¶ 3-4, 6-7, 9.)

Plaintiffs argue that the defendants' system of companies is extremely large and the lines between related companies are often blurred. They state that they took the depositions of two former employees, who were unsure of the differences among the companies or which ones they worked for. Plaintiffs argue that Bobby Duey, the former Plant Manager at EME Homer City, testified that: he reported to John Kennedy in Chicago and he thought Kennedy worked for Midwest Generation (Duey Dep. at 13-14)[4]; that Kennedy reported to Guy Gorney and Duey was unsure who Gorney worked for although he assumed it was Midwest Generation (id. at 60); that he was unsure if Homer City was a subsidiary of EMG for Capital Investment Planning (id. at 96-97); that he could not say if EMG personnel were involved in the aftermath of the explosion (id. at 76); and that he thought he reported to Midwest Generation even though the organizational chart shows no reporting relationship between these two companies (id. at 39). Plaintiffs note that EIX newsletters indicate that Kennedy worked for EMG. (ECF No. 33 Ex. 9.)

Plaintiff further argue that Guy Gorney, Senior Vice President of EMG and Midwest Generation, testified that: he believed that he was employed by EME or Midwest Generation (Gorney Dep. at 8)[5]; that he had responsibility for the Homer City plant (id. at 9); that he did not know which company employed him as Senior VP—Generation (id. at 10); that Midwest Generation is concerned only with the six coal-fired plants in Illinois and not the plant in Pennsylvania (id. at 8-11); that he was unsure if he was an employee of EMG or even what that company did (id. at 19-20); that he was unsure of his position even when shown articles from Business Week and the Chamber of Commerce identifying him as Senior VP of Generation for

---

[4] ECF No. 33 Ex. 6.
[5] ECF No. 33 Ex. 3.

EMG (id. at 21-23; ECF No. 33 Ex. 8).

In their reply brief, the moving defendants argue that the "confusion" Plaintiffs claim that Gorney and Duey have is both irrelevant and overstated. First, although Plaintiffs contend that Gorney was the Senior Vice President of EMG and President of Midwest Generation EME, LLC. (Gorney Dep. at 11-12), Gorney was also President of Mission Energy Westside, Inc., the general partner of EME Homer City. (Needham Decl. ¶ 8.)[6] The moving defendants further state that Kennedy is currently a vice president of Mission Energy Westside and that he is also a vice president of Chestnut Ridge Energy Co., both positions he has held since January 5, 2009. (Needham Decl. ¶ 9.)

They thus observe that Gorney's interaction with Homer City plant personnel and duties regarding plant matters were discharged in his capacity as President of the general partner of EME Homer City, not any position he held with EMG, the holding company. (Clarke Dep. at 27:2-30:18, 38:9-24. )[7] Gorney was also not an employee of EMG. (Clarke Dep. at 16:23-17:4.) They also note that Gorney retired in January 2011, before the accident (Gorney Dep. at 6:22-7:4), so it is not surprising that he now lacks perfect recall of EIX's corporate structure and the roles he held.

Second, Duey is the former Plant Manager at EME Homer City, the entity that formerly operated the plant. (Duey Dep. at 13-14.) Duey testified that EME Homer City operated the plant and that he—not any employee of any other EIX-related company—was in charge of "[t]he day-to-day operations of the plant, future planning, budget planning, assurance of environmental compliance, assurance of safety. Everything inside the fence." (Duey Dep. at 14:21-15:7, 142:4-8.) Duey testified that he reported to Kennedy, who in turn reported to Gorney. (Duey Dep. at

---

[6] ECF No. 35 Ex. I.
[7] ECF No. 35 Ex. J.

13:12-14:19; see also Gorney Dep. at 28:8-11.) Again, the moving defendants note that Gorney received those plant-related reports in his role as President of the general partner of EME Homer City (Clarke Dep. at 27:2-30:18, 38:9-24.) The moving defendants argue that Plaintiffs repeatedly assert that Duey mistakenly believed that Kennedy and Gorney held positions with Midwest Generation, and then attempt to paint Duey as confused. The moving Defendants respond that Duey's impression was not wrong—both Kennedy and Gorney did have roles at Midwest Generation LLC, in addition to the other positions they held. See Clarke Dep. at 50:6-16. But Kennedy also served as Vice President of both the limited and general partners of EME Homer City. (Needham Decl. ¶ 9.)

Plaintiffs argue that:

At the pleading stage, before discovery, it would be impossible for the Plaintiff to know the relatedness of the vast array of EIX companies when even the employees directly involved in the day to day operations of the plant were unsure of the roles each company played.

Should the Court believe that the averments of the Complaint are deficient, then in the alternative, Plaintiffs request that they be given leave to amend their Complaint to reflect information discovered through jurisdictional discovery. If permitted to amend their Complaint, Plaintiffs will allege in more detail the actions of EMG, EIX, EMOMI, and EMMT in the overall operation and management of the Homer City Power Plant.

(ECF No. 33 at 9.) However, they have not submitted a proposed amended complaint, nor have they explained what information they would add to further detail the actions of these defendants in the overall operation and management of the plant.[8]

Based upon the motion, the materials submitted and the briefs, Plaintiffs have not sufficiently alleged involvement by the individual moving defendants. Their generalized allegations as to all of the defendants do not indicate how the moving defendants were involved

---

[8] In addition, as the moving defendants note, the Complaint does not list EMMT as a defendant with respect to any of the three counts alleged.

in the actions or omissions that led to the accident, and the confusion in the testimony of Gorney and Duey does not advance Plaintiffs' case. In addition, for the reasons that follow, Plaintiffs have not demonstrated that personal jurisdiction can be asserted over two of the moving defendants.

Personal Jurisdiction

"Once it is challenged, the burden rests upon the plaintiff to establish personal jurisdiction. A nexus between the defendant, the forum and the litigation is the essential foundation of in personam jurisdiction." General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (citation omitted). "The plaintiff must sustain its burden of proof through 'sworn affidavits or other competent evidence.'" North Penn Gas v. Corning Natural Gas Corp., 897 F.2d 687, 689 (3d Cir. 1990) (quoting Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984)). The court initially must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff," although it can reconsider the issue "if it appears that the facts alleged to support jurisdiction are in dispute," and can conduct an evidentiary hearing to resolve any disputed facts. Carteret Savs. Bank, FA v. Shushan, 954 F.2d 141, 142, n.1 (3d Cir. 1992). See also Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

There are two alternative ways to establish personal jurisdiction. "General personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are 'continuous and systematic.'" BP Chemicals, Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000) (quoting Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 416 (1984)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation it is an equivalent place, one in which

the corporation is fairly regarded as home." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2853-54 (2011).

Specific personal jurisdiction, on the other hand, arises from a defendant's forum related activities and may be established even where the defendant has not physically appeared in the state but has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 73 (1985) (citations omitted). It is defendant specific. Rush v. Savchuk, 444 U.S. 320, 332 (1980).

> As summarized by the Court of Appeals:
>
> The inquiry as to whether specific jurisdiction exists has three parts. First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. Helicopteros, 466 U.S. at 414, 104 S.Ct. 1868; Grimes v. Vitalink Commc'ns Corp., 17 F.3d 1553, 1559 (3d Cir. 1994). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"

O'Connor v. Shady Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (quoting Burger King, 471 U.S. at 472, 476) (footnote omitted).

The Federal Rules of Civil Procedure authorize a district court to assert personal jurisdiction over a non-resident to the extent permissible under the law of the state where the district court sits. Fed.R.Civ.P. 4(k)(1)(A). O'Connor, 496 F.3d at 316. Pennsylvania authorizes its courts to exercise maximum general and specific jurisdiction over corporations and other entities. First, the plaintiff may show general jurisdiction pursuant to 42 Pa. C.S. § 5301(a)(2)(iii) and (a)(3)(iii) by showing "[t]he carrying on of a continuous and systematic part of the general business within this Commonwealth." Second, the plaintiff may show specific jurisdiction pursuant to Pennsylvania's long arm statute, 42 Pa. C.S. § 5322(a) by showing that

defendant has engaged in forum related activities, including "[c]ausing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth," § 5322(a)(4).

Pennsylvania also authorizes exercise of the jurisdiction of its courts over non-residents "only where the contact is sufficient under the Constitution of the United States," 42 Pa. C.S. § 5308, and "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S. § 5322(b). See Kubik v. Letteri, 614 A.2d 1110, 1114 (Pa. 1992) (following Burger King analysis).

General Personal Jurisdiction

In Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408 (1984), the Supreme Court explained how to determine whether the contacts of the foreign defendant are sufficient to confer general personal jurisdiction. In Helicopteros, the contacts of Helicol, a Colombian corporation, with Texas consisted of sending its chief executive officer to Houston for a contract negotiation session; accepting into its New York and Florida bank accounts checks drawn on a Houston bank; purchasing approximately 80% of its fleet of helicopters as well as spare parts and accessories for more than $4 million from Bell Helicopter Company in Texas; and sending pilots and maintenance personnel to Bell's facilities in Texas for training and to ferry the aircraft to South America. Id. at 410-11. The Supreme Court noted that there had been no other business contacts between Helicol and Texas; Helicol had never been authorized to do business in Texas and had never had an agent for the service of process within the State; it had never performed helicopter operations in Texas or sold any product that reached Texas; it had never solicited business in Texas, signed any contract in Texas, had an employee based in Texas, recruited an employee in Texas, owned any real or personal property in Texas, or maintained an

office or establishment there; and Helicol maintained no records in Texas and had no shareholders in the State.

In addition, none of the respondents or their decedents were domiciled in Texas. Id. at 411-12. The Supreme Court determined that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." Id. at 418. The Court further found the fact that the defendant had sent personnel into Texas for training in connection with the purchase of helicopters and equipment in Texas did not in any way enhance the nature of Helicol's contacts with the State. Id.

Thus, Helicopteros sets a high standard that must be met to justify the exercise of general personal jurisdiction. Provident Nat'l Bank v. California Fed. Savs. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). See also Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 787 (7th Cir. 2003) ("the constitutional requirement for general jurisdiction is considerably more stringent than that required for specific jurisdiction."); United States v. Swiss American Bank, Ltd., 274 F.3d 610, 619 (1st Cir. 2001); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997).

Plaintiffs point to the following to support general personal jurisdiction over EMG: 1) it owns a coal-fired plant (Homer City) and two wind farms in Pennsylvania (ECF No. 33 Ex. 4); 2) EIX and EMG declared that Gorney, the Senior VP of Generation for EMG, had responsibility for operations of the Homer City plant; 3) Duey testified that he reported to an EMG supervisor (Kennedy) who in turn reported to Gorney (Duey Dep. at 13-14); 4) Duey testified that he would consult with Kennedy regarding management at Homer City (Duey Dep. at 22-23); 5) the administrative manager at the plant for Human Resources reported to payroll and HR personnel

in the Chicago office of EMG even though Duey mistakenly thought it was Midwest Generation (Duey Dep. at 24-25); 6) Duey had weekly phone conferences with Kennedy's successor, Don Clayburgh, which included all power plant managers in Illinois and Pennsylvania (Duey Dep. at 36); 7) Duey communicated every few days with Kennedy or Clayburgh by email (Duey Dep. at 37-38); 8) Duey attended meetings relative to the Homer City plant in Chicago and California (Duey Dep. at 41-44); 9) when the subject pipe explosion occurred, he called or spoke to Clayburgh, Kennedy and Pedro Pizarro (President of EMG) (Duey Dep. at 74-77); 10) Duey believed that personnel at Midwest Generation had the ability to direct him to defer or not defer an outage at the plant, but these individuals were EMG employees and outages were deferred in 2009 through the time of the pipe rupture, which OSHA determined was caused by lack of maintenance on the pipe (ECF No. 34 Ex. 15 at 1-6); 11) when it was determined that the plant would be transferred to GE, Kennedy came to speak to the Homer City plant employees about the transition plans (Duey Dep. at 104); 12) Duey would use Kent Wanninger, Director of Environmental Controls and Strategy at EMG, for technical support and Wanninger visited the plant to discuss technical issues (Duey Dep. at 107-09, 112); 13) in January 2012, EMG invited residents of Homer City to the plant to attend a community information session to learn about a major new pollution control project at the Homer City plant (Duey Dep. at 124); 14) after the explosion, EMG sent a response team to the plant to do a root cause analysis (Duey Dep. at 130); and 15) EMG owned and operated two wind farms in Pennsylvania which were managed locally by Doug Vance for EMG and Gorney had supervisory responsibility for them (Gorney Dep. at 25).

The moving defendants respond that: 1) in SEC filings, in public statements and informally among executives and employees of EIX and its affiliates, "Edison Mission Group"

and "EMG" were used as shorthand for a "business segment" of EIX[9] describing a collection of individual businesses that conducted operations and the Homer City plant and two wind farms were owned by indirect subsidiaries of EMG, not by EMG the holding company (Clarke Dep. at 60:3-61:15, 114:20-115:18, 120:3-123:8; ECF No. 35 Ex. K at 3, Ex. L at 2-3); 2) Gorney's responsibilities were undertaken in his capacity as President of the general partner of EME Homer City, not as an officer of EMG (Clarke Dep. at 27:2-30:18, 38:9-24)[10]; 3) Don Clayburgh is also vice president of Mission Energy Westside and Chestnut Ridge Energy Co., both positions he has held since March 16, 2011 (Needham Decl. ¶ 10); 4) EMG, a holding company, has no employees and no Chicago office (Scilacci Decl. ¶ 4; Clarke Dep. at 19:22-20:15, 71:19-73:9, 125:2-11, 128:10-20)[11]; 5) Duey's act of attending meetings in Chicago and California does not show EMG or EIX reaching into Pennsylvania and making jurisdictional contacts; 6) the meeting about pollution control was set up and run by the Pennsylvania Department of Environmental Protection (Duey Dep. at 124:16-128:4); and 7) Duey never referred to an EMG response team in his conversations with OSHA and EMG has no employees (Duey Dep. at 129:24-131:20).

Plaintiffs point to the following to support general personal jurisdiction over EIX: 1) it owned an interest in the Beaver Valley Nuclear Plant in Shippingport, Pennsylvania which it sold in 2012 for $108 million (ECF No. 34 Ex. 16); 2) it imposed an ethics and compliance code on all employees, including those at the Homer City plant (id. Ex. 17); 3) it provided the

---

[9] The moving defendants state that the shorthand reference also served to distinguish EMG as EIX's competitive power business segment from EIX's other principal business segment, Southern California Edison, a regulated utility in southern California. (ECF No. 35 Ex. L at 3.)

[10] The moving defendants note that this fact also responds to Plaintiffs' points 3, 4, 6, 7, 9, 10, 11 and 15.

[11] The moving defendants note that this fact also responds to Plaintiffs' points 5, 7, 8, 9, 10 and 12.

employees of Homer City with the EIX Benefits Handbook (id. Ex. 18); 4) it administered the retirement plan for the bargaining unit employees of EME Homer City (id. Ex. 19); 5) it administered the medical plan (id. Ex. 20); 6) it put into place an insurance program for workers compensation and general liability insurance that applied to all affiliated companies including Homer City; 6) it provides corporate and administrative services to its various subsidiaries, including EME Homer City, such as its Intercompany Billing and Payment Policy (id. Ex. 21) and its Intercompany Billing and Payment Terms and Procedures (id. Ex. 22).

The moving defendants respond that: 1) the 2012 10-K explains that the interest in the Shippingport plant was in fact owned and sold by Edison Capital, a separate and indirect subsidiary of EIX, not by EIX itself (ECF No. 35 Ex. K at 2, 25, 41-42); and 2) the services which Plaintiffs cite as EIX administering with the operator of the plant do not demonstrate that EIX was "present" in Pennsylvania for jurisdictional purposes and many of them are derived from an unspecified bankruptcy filing (which postdates the accident herein) describing shared services "between EIX and EME" and does not mention the plant or EME Homer City. (ECF No. 34 Ex. 23).

Plaintiffs argue that the explanation that the term "EMG" refers to a business segment of EIX rather than the holding company "is inconsistent with the statements made by EMG (the company) itself. The 2011 10-K filings state that EMG is a 100% owner of Homer City and the two (2) Pennsylvania wind farms." (ECF No. 33 at 19.) As the moving defendants observe, however, Plaintiffs have selectively quoted from corporate documents. They have submitted page 13 from EIX's 2011 10-K, which states that "EMG" owns the Homer City plant and the two wind farms in Pennsylvania (ECF No. 33 Ex. 4). But pages 2 and 3 of the same Form 10-K explain that EMG is a holding company that owns stock in other companies, that references to

"EMG" mean "each such company with its subsidiaries on a consolidated basis" and that

"Edison International has two business segments for financial reporting purposes," one of which

is its "competitive power generation segment (EMG)." (ECF No. 35 Ex. L at 2-3.) Mark Clarke,

Vice President and Controller of EIX, confirmed that the Homer City plant and the two wind

farms are owned by indirect subsidiaries of EMG, not by EMG the holding company. (Clarke

Dep. at 115:8-15, 120:3-8.) Thus, the evidence does not support the claim that EIX or EMG had

continuous and systematic contacts with Pennsylvania.[12]

Plaintiffs argue in the alternative that EIX and EMG are alter egos of EME Homer City.

However, the separate existence of corporate entities "is generally respected for jurisdictional

purposes, and the activities of one entity are imputed to another only if Plaintiff establishes that

they should be regarded as alter egos." Bootay v. KBR, Inc., 2010 WL 1257716, at *2 (W.D. Pa.

Mar. 26, 2010) (McVerry, J.), aff'd mem., 437 F. App'x 140, 143 (3d Cir. 2011). Plaintiffs

"must overcome the general rule that mere ownership of a subsidiary does not subject the parent

corporation to personal jurisdiction in the state of the subsidiary." Action Mfg. Co. v. Simon

Wrecking Co., 375 F. Supp. 2d 411, 420 (E.D. Pa. 2005).

Judge McVerry has stated that:

> "A subsidiary will be considered the alter-ego of its parent only if the
> parent exercises control over the activities of the subsidiary." Clemens v. Gerber
> Scientific, Inc., Civ. A. No. 87-5949, 1989 WL 3480 (E.D. Pa. Jan. 13, 1989). To
> prevail under its alter ego theory, Plaintiff must demonstrate that "[t]he degree of
> control exercised by the parent [is] greater than normally associated with common
> ownership and directorship." In re Latex Gloves Products Liability Litig., No.
> MDL 1148 (Aug. 22, 2001) 2001 WL 964105 *3 (E.D. Pa. 2001). See also Visual
> Sec. Concepts, Inc. v. KTV, Inc., 102 F. Supp. 2d 601, 605 (E.D. Pa. 2000); Arch
> v. American Tobacco Co., Inc., 984 F. Supp. 830, 837 (E.D. Pa. 1997). "Plaintiff
> must prove that the parent controls the day-to-day operations of the subsidiary

---

[12] Plaintiffs also state that EMOMI and EMMT have locations in Pennsylvania (ECF No. 33 at 4)
but these defendants are not moving to dismiss for lack of personal jurisdiction, so these contacts
are irrelevant.

such that the subsidiary can be said to be a mere department of the parent." <u>Latex Gloves</u>, 2001 WL 964105, *3 (citing <u>Arch</u>, <u>supra</u>.).

<u>Componentone, L.L.C. v. ComponentArt, Inc.</u>, 2007 WL 776930, at *5 (W.D. Pa. Mar. 12, 2007). In that case, the plaintiff pointed to the following facts: 1) ComponentArt Holdings owned 100% of the shares of ComponentArt, Inc.; 2) ComponentArt Holdings was engaged in no commercial activity other than "holding" the stock; 3) ComponentArt Holdings had no separate office facilities but instead occupied the same offices as ComponentArt, Inc.; and 4) the two entities had significant overlapping of directors and officers. The court concluded that:

> While Plaintiff points to a number of factors which do suggest a high degree of intimacy and communality between the two entities, it offers no evidence from which an inference can be drawn that the two corporations do not respect normal corporate formalities, or do not deal with each other as separate legal entities, or that ComponentArt Holdings controls the day-to-day operations of ComponentArt Inc. such that ComponentArt Inc. can "be said to be a mere department of the parent." <u>Latex Gloves</u>, 2001 WL 964105, *3.

<u>Id.</u>

The moving defendants point to the following evidence to demonstrate that EIX and EMG are not alter egos of EME Homer City: 1) articles of incorporation show that the entities are all separately incorporated (ECF No. 30 Exs. B, C, E, F); 2) the partnership agreement for EME Homer City shows that it is owned by Chestnut Ridge Energy Co. and Mission Energy Westside, Inc., not by EIX or EMG (ECF No. 35 Ex. G); 3) minutes of meetings of the boards of directors of EIX, EMG and the limited and general partners of EME Homer City show that each entity had its own separately convening board; 4) a lease agreement shows that none of moving defendants was a lessee of the plant (ECF No. 30 Ex. H); and 5) exemplar contracts for the purchase of coal for and transport of same to the plant show that it was EME Homer City, and not EIX or EMG, which bought the coal and procured the transport.

Courts have held that the argument that jurisdictional contacts of subsidiaries should be

imputed to a parent organization because certain individuals served as officers and/or directors of both the parent and the subsidiaries "fails as a matter of law." ClubCom, Inc. v. Captive Media, Inc., 2009 WL 249446, at *18 (W.D. Pa. Jan. 31, 2009) (McVerry, J.)  See generally United States v. Bestfoods, 524 U.S. 51, 69 (1998) (recognizing the "well established principle … that directors and officers holding positions with a parent and its subsidiary can do 'change hats' to represent the two corporations separately, despite their common ownership.") (citation omitted). In addition, courts have rejected the argument that SEC filings that refer to both foreign holding companies and entities owned by them are sufficient to show that the holding company had continuous and systematic presence in the forum state.  See Heinrich v. Service Corp. Int'l, 2009 WL 217729, at *4 (W.D. Pa. July 22, 2009); Action Mfg., 375 F. Supp. 2d at 424.  Nor is the use of a common employee handbook or use of common human resources services significant. Heinrich, supra.  Finally, Plaintiffs have not cited to any authority "to support the notion that the mere fact that a parent corporation handles certain insurance matters on behalf of its subsidiary necessarily infringes on the formalities of corporate separation."  China Basin Properties, Ltd. v. Allendale Mut. Ins. Co., 818 F. Supp. 1301, 1306 (N.D. Cal. 1992).

Based upon the record, Plaintiffs have failed to demonstrate that EMG and EIX are the alter egos of EME Homer City.  Thus, they have failed to substantiate their argument that the Court can exercise general personal jurisdiction over these defendants.

Specific Personal Jurisdiction

Determining whether specific personal jurisdiction can be exercised over a defendant is claim specific.  Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001).  In Remick, the Court of Appeals concluded that the district court in Pennsylvania had specific personal jurisdiction over an Indiana client and his Illinois agent with respect to his former attorney's breach of contract

and tortious interference with contractual relations claims, but did not have specific personal jurisdiction over the attorney's defamation and misappropriation of image claims.

In Count I, Plaintiffs allege that the defendants were negligent in maintenance and repair to an inlet superheater feeder pipe, such that it burst and spewed steam in the area where Miller was inspecting scaffolding. For purposes of a non-intentional tort such as negligence, personal jurisdiction exists if the defendant has purposely directed its activities at the forum, if the litigation "arises out of or relates to" at least one of those activities and if the exercise of jurisdiction comports with fair play and substantial justice. O'Connor, 496 F.3d at 317. In that case, the court held that specific personal jurisdiction could be exercised over a Barbados resort when a patron, who had been enticed back to the resort by multiple mailings and phone calls that included invitations to utilize the resort's spa treatments, was injured when he slipped and fell at the spa.

In support of specific personal jurisdiction over EMG, Plaintiffs argue that: 1) Gorney testified that EMG was responsible for the "operations part of all those assets," including Homer City, the Illinois coal plants and the wind farms and including safety issues (Gorney Dep. at 26-28); 2) EMG ran periodic safety summits for the coal plants including Homer City (ECF No. 34 Ex. 13); and 3) deferrals of outage during which maintenance of items such as the pipe at issue were directed in part by Kennedy and Clayburgh who were employees of EMG (Duey Dep. at 91-95).

The moving defendants respond that: 1) to the extent that Gorney had responsibilities for the operation of the Homer City plant, it was in his capacity as President of the general partner of EME Homer City, not any position he held with the holding company, and as explained above "EMG" as used in various documents is shorthand for EIX's business segment, not the holding

company; 2) the safety summit referenced by Plaintiffs took place in Chicago and does not support a jurisdictional contact with Pennsylvania; and 3) "deferrals of outage" could not have been directed by Kennedy or Clayburgh as "employees of EMG" because EMG had no employees and any reports they received were in their capacity as officers of the limited and general partners of EME Homer City. (Clarke Dep. at 27:2-30:18, 38:9-24; Needham Decl. ¶¶ 8-10.)

In support of specific personal jurisdiction over EIX, Plaintiffs argue that EIX "performs insurance services for its subsidiaries, including risk assessment and management" and that EIX is subject to the Court's personal jurisdiction "to the extent it was involved in risk assessments and management at Homer City that encompasses the steam pipes." (ECF No. 33 at 24.) The moving defendants respond that Plaintiffs cite to no evidence of EIX's involvement in risk assessments and management and that sharing insurance services, a routine activity for parents and subsidiaries, does not support the exercise of personal jurisdiction over the parent. In addition, they note that Plaintiffs cite a "draft complaint" that the "Official Committee of Unsecured Creditors" has proposed to file in the bankruptcy case (ECF No. 34 Ex. 24), but they have not explained how unfiled, unsubstantiated allegations offered by different plaintiffs in a separate case could be relevant in this matter.

Plaintiffs have failed to point to evidence from which sufficient minimum contacts for specific personal jurisdiction could be asserted over EIX or EMG. Therefore, the moving defendants' motion to dismiss should be granted.

For these reasons, it is recommended that the motion to dismiss submitted on behalf of defendants Edison International, Edison Mission Group, Inc., Mission Energy Holding Co., Edison Mission Operation & Maintenance, Inc. and Edison Mission Marketing & Trading, Inc.

(ECF No. 29) be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by October 23, 2013. Any party opposing the objections shall file a response by November 6, 2013. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: October 9, 2013